## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff/Respondent,<br><br>vs.<br><br>MARTIN JAMES WALSH,<br><br>Defendant/Movant. | Cause No. CR 17-23-BU-DLC<br><br><br>ORDER |

This case comes before the Court on Defendant Martin James Walsh's amended motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255.  Walsh initially appeared *pro se* but is now represented by appointed counsel Ryan Heuwinkel.  The United States is represented by Assistant United States Attorney Tom Bartleson, who, like Heuwinkel, did not litigate the criminal case.

Walsh pled guilty to a drug trafficking charge after a warrant search of his home resulted in discovery of about 280 grams of a substance containing a very high concentration of methamphetamine. `He points to evidence indicating that Madison County Sheriff Roger Thompson obtained the warrant by making material misrepresentations about a confidential informant.  As Thompson was also the lead officer in the ensuing search, Walsh's § 2255 motion brings more than the warrant application into question.

1

# I. Background

## A. Proceedings Against Walsh in This Court

A grand jury indicted Walsh on one count of conspiring to possess more than 50 grams of actual methamphetamine with intent to distribute, a violation of 21 U.S.C. § 846 (Count 1), and one count of possessing more than 50 grams of actual methamphetamine with intent to distribute, a violation of 21 U.S.C. § 841(a)(1) (Count 2). Both offenses were alleged to have occurred between June 2016 and June 2017. *See* Indictment (Doc. 1) at 2. Although Walsh had no prior drug convictions, conviction on either charge would subject him to a ten-year mandatory minimum sentence and a maximum sentence of life in prison. *See* 21 U.S.C. § 841(b)(1)(A)(viii).[1]

Initially, the Federal Defenders of Montana represented Walsh. About a month after he appeared on the indictment, they discovered a conflict with another client, and new counsel was appointed. *See* Order (Doc. 20). Trial was set for

---

[1] The statute differentiates between "methamphetamine" and "a mixture or substance containing methamphetamine." *See* 21 U.S.C. § 841(b)(1)(A)(viii), (B)(viii). Rather unhelpfully, the corresponding Sentencing Guideline differentiates among "Methamphetamine," meaning a mixture or substance containing methamphetamine; "Methamphetamine (actual)," meaning the controlled substance itself apart from any cutting agent or contaminator; and "'Ice,'" meaning a mixture or substance at least 80% of which is d-methamphetamine hydrochloride. *See, e.g.*, U.S.S.G. § 2D1.1(c)(1), Notes to Drug Quantity Table (A)–(C). The indictment alleged "more than 50 grams of actual methamphetamine," a clear phrase that does not precisely conform with the terms of the statute, which says "50 grams or more of methamphetamine . . . or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine."

2

March 12, 2018, *see* Order (Doc. 21), then continued on Walsh's motion to April 30, 2018, *see* Order (Doc. 29).

On April 17, 2018, the parties filed a plea agreement. Acting on the agreement, the United States filed a superseding information charging Walsh with one count of possessing 500 grams or more of a substance containing methamphetamine with intent to distribute it, a violation of 21 U.S.C. § 841(a)(1). The offense was alleged to have occurred in the same time frame, between June 2016 and June 2017, and it triggered the same penalty range as the indictment, a ten-year mandatory minimum and a maximum of life. *See* Superseding Information (Doc. 41) at 1–2.

Walsh agreed to plead guilty to the superseding information, and the United States agreed to dismiss the indictment. The parties agreed to recommend a base offense level of no more than 32, and the United States agreed to recommend a sentence at the low end of the advisory guideline range determined by the Court. *See* Plea Agreement (Doc. 42) at 2 ¶¶ 2–3, 6 ¶ 6. Walsh also agreed to waive "any right to appeal or to collaterally attack the conviction . . . and sentence." *Id.* at 6–7 ¶ 8. On May 7, 2018, Walsh pled guilty to the superseding information in open court. *See* Minutes (Doc. 47); Change of Plea Tr. (Doc. 77) at 34:6–10.

At sentencing, Walsh was held responsible for the 260.8 grams of actual methamphetamine that was seized from his home during execution of a search

3

warrant on June 17, 2017. His base offense level was 32, corresponding to 1.5 to 5 kilograms of a substance containing methamphetamine or 150 to 500 grams of actual methamphetamine. *See* U.S.S.G. § 2D1.1(c)(4) (Nov. 1, 2016). Walsh received a two-point enhancement for possessing a firearm and a three-level reduction for his timely guilty plea. With a total offense level of 31 and a criminal history category of I, and in view of the 120-month mandatory minimum sentence, Walsh's advisory guideline range was 120 to 135 months. *See* Statement of Reasons (Doc. 66) §§ I(B), III, VIII; Presentence Report ¶¶ 34–44, 47–60; Sentencing Tr. (Doc. 78) at 58:3–59:14.

On August 22, 2018, Walsh was sentenced to serve the statutory mandatory minimum sentence of 120 months in prison, to be followed by a five-year term of supervised release. *See* Judgment (Doc. 65) at 2–3.

Walsh did not appeal. His conviction became final when his time to appeal expired on September 5, 2018. *See Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012).

## B. Post-Judgment Events and Proceedings

On September 6, 2018—the day after Walsh's time to appeal expired—the State of Montana filed criminal charges against Madison County Sheriff Roger Thompson for felony tampering with evidence, felony perjury, and misdemeanor official misconduct. These charges arose from Thompson's actions and statements in Walsh's case.

4

On January 31, 2019, Walsh, acting *pro se*, timely filed his original motion under 28 U.S.C. § 2255.  *See* 28 U.S.C. § 2255(f)(1); *Gonzalez*, 565 U.S. at 150. Counsel Heuwinkel was appointed to represent him (Doc. 74).  He filed an amended motion on March 25, 2019 (Docs. 82–86), and also requested an opportunity to conduct discovery (Doc. 87).  The United States filed an answer (Docs. 94–95) and Walsh a reply (Docs. 106–117).

The procedural posture of the case became confusing at that point.  Both parties submitted exhibits with their pleadings and motions, and the parties deposed trial counsel after the United States had filed its answer but before Walsh filed his reply.  On September 27, 2019, the Court required the parties to state whether the exhibits they had filed could be considered as if they had been presented at a hearing (that is, with foundation and authenticity established).  The United States was also permitted to supplement its answer and, if it did so, Walsh was permitted to supplement his reply.  *See* Order (Doc. 118) at 1–2.

The United States supplemented its answer on October 11 (Doc. 120), and Walsh supplemented his reply on November 1, 2019 (Doc. 121).  Both parties agreed that the Court could consider all the exhibits as if they were introduced at a hearing.  *See* U.S. Supp. Ans. (Doc. 120) at 2; Walsh Notice (Doc. 119) at 1.

On February 18, 2020, Walsh filed yet another supplement (Doc. 122), following conclusion of the state criminal proceedings against Thompson.  The

5

Court permitted the United States to submit yet another supplement in response. It did so on February 28, 2020 (Doc. 124).

The United States asks the Court to deny the § 2255 motion on the existing record and without a hearing. *See* Second U.S. Supp. Ans. (Doc. 124) at 9; U.S. Supp. Ans. (Doc. 120) at 17–18. Walsh asks that his motion be granted without a hearing, or, if the motion is not granted, that he be permitted to take discovery. *See* Walsh Notice at 1–2; Walsh Supp. Reply (Doc. 121) at 2–3.

## II.  Walsh's Claims

Walsh brings two claims for relief:

- The United States violated Walsh's right to due process by failing to disclose the existence of the State's investigation into Sheriff Thompson's conduct in connection with Walsh's case. *See* Am. § 2255 Mot. (Doc. 82) at 10 ¶ 20, 11 ¶¶ 23–24, 13 ¶ 29, 14 ¶ 32, 15–16 ¶ 34, 16 ¶ 35, 17 ¶ 39, 19 ¶ 46; *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 153–55 (1972).

- Trial counsel violated Walsh's Sixth Amendment right to effective assistance of counsel by failing to investigate a discrepancy between the United States' original discovery and supplemental discovery produced on March 6, 2018, as well as the dismissal of state charges against Walsh's wife. *See* Am. § 2255 Mot. (Doc. 82) at 10 ¶ 22, 12 ¶ 27, 14 ¶ 32, 19–20 ¶ 47; *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984).

## III.  Claim 1: *Brady* Violation

The prosecution must disclose to the defense any evidence in its possession that is material to guilt or punishment. *See, e.g., Brady v. Maryland*, 373 U.S. 83,

87 (1963).  Evidence is material if it is reasonably likely, in combination with all the other evidence, to "put the whole case in such a different light as to undermine confidence in the verdict."  *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 434–38 (1995) (discussing materiality under *United States v. Bagley*, 473 U.S. 667 (1985)).

The United States asserts that Walsh's plea agreement waived his right to file a *Brady* claim under 28 U.S.C. § 2255.  *See* Answer (Doc. 94) at 10–11; Plea Agreement (Doc. 42) at 6–7 ¶ 8.

The plea agreement provides:

In exchange for this agreement the defendant waives any right to appeal or to collaterally attack the conviction, entry of judgment, and sentence.  The defendant acknowledges that this waiver shall result in the dismissal of any appeal or collateral attack the defendant might file challenging the plea, conviction or sentence in this case.  The defendant shall retain the right to file one direct appeal only if one of the following unusual circumstances occurs; the defendant understands that these circumstances occur rarely and that in most cases this agreement constitutes a complete waiver of all appellate rights: . . . .

Plea Agreement (Doc. 42) at 6–7 ¶ 8.  The "unusual circumstances" allowed an appeal if the sentence exceeded the statutory maximum (which was life in prison); if the court arrived at a guideline range by departing upward under "Chapter 5K of the Guidelines"; or if the sentence exceeded the advisory guideline range.  *See id.* at 7 ¶ 8.[2]

---

[2]  In the event the United States moved for a sentence reduction under U.S.S.G. § 5K1.1,

Walsh's *Brady* claim arises from state authorities' investigation into alleged misconduct by Thompson in Walsh's case simultaneously with Walsh's prosecution in this Court.  Some evidence indicates the United States knew about the State's investigation of Thompson, and one witness speculated that the United States might have contemplated opening a federal investigation.  *See* Fortner Interview (Doc. 110) at 6, 8 (Undersheriff Fortner recalls a federal agent asking "what are you trying to tell me" and recalls "it was pretty apparent to me at that time initially um, the talk was they might have a[n] open federal corruption case and then later I got a call saying they would defer" to the State investigation); *see also* "Potential Impeachment Information" items iii, v(1), vi (Doc. 104-14 at 9–10) (United States clarifies law enforcement agencies' disclosure obligations, noting that agencies "should make broad disclosures . . . so that the prosecutor can assess the information").  On March 12, 2018, Montana DOJ Agent Hilyard explained in an internal report that the Thompson incident came to light because of the United States' request for impeachment information.  *See* Hilyard Report Mar. 12, 2018 (Doc. 104-14 at 1).  The United States made the request in connection with Walsh's case.

---

Walsh waived all right to appeal the sentence, including even these three reservations, as well as his right to collateral attack, excepting "the right to pursue an action alleging ineffective assistance of counsel."  Plea Agreement (Doc. 42) at 7–8 ¶ 8.  As the United States did not file a § 5K1.1 motion, this provision was not activated.

But, as explained below, the United States disclosed the information that led State authorities to open an investigation. The existence of an investigation is not particularly exculpatory. More troubling than the nondisclosure is the plea agreement's waiver of "any right . . . to collaterally attack the conviction, entry of judgment, and sentence." Such a broad and unqualified waiver is unusual in plea agreements in this District, and it appears to have been included when the United States probably was aware of the State's investigation and Walsh certainly was not.

Regardless, the Court need not decide whether the United States violated *Brady* or whether Walsh's waiver of the *Brady* claim is valid. Counsel likely would have discovered the same facts the State was investigating if he had done a little investigation of his own.

## IV.  Claim 2: Ineffective Assistance of Counsel

Walsh claims that his trial counsel was ineffective because he failed to investigate a discrepancy between Sheriff Thompson's warrant application and the report of another officer involved in the case. The parties have presented a great deal of information, but the claim is specific and limited in scope. Two questions must be resolved: Was it unreasonable for counsel to fail to investigate this discrepancy? And is there a reasonable probability the outcome of the case would have been better for Walsh if counsel had investigated?

*Strickland v. Washington*, 466 U.S. 668 (1984), sets the standards with

respect to claims alleging ineffective assistance of counsel. First, Walsh must show that counsel's performance fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687-88. Counsel's performance need not be perfect, but it must fall "within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). Second, Walsh must also show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is *less* than a preponderance of the evidence. *See id*. It is "a probability sufficient to undermine confidence in the outcome." *Id*.

### A. Counsel's Performance

The *Strickland* test is highly deferential to counsel, because "[t]here are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689. To determine whether counsel performed reasonably, a court must view the situation from counsel's perspective at the time and consider what counsel knew and when he knew it. Hindsight, of course, complicates that effort, so courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." In other words, courts begin from the assumption that counsel's acts "might be considered sound trial strategy." *See Strickland*, 466 U.S. at 689.

10

> [S]trategic choices made after thorough investigation of law and facts
> relevant to plausible options are virtually unchallengeable; and
> strategic choices made after less than complete investigation are
> reasonable precisely to the extent that reasonable professional
> judgments support the limitations on investigation.

*Id.* at 690–91.

### 1. Was the Plea Agreement "Highly Beneficial"?

The United States argues that trial counsel performed reasonably because he "negotiated a plea agreement to a superseding information that was highly beneficial to Walsh." Answer (Doc. 94) at 19.

No lawyer can do everything in a client's defense. Every lawyer must consider reasonably available alternatives and decide where time and effort are likely best invested. A lawyer may reasonably advise a client to accept a plea agreement, even if doing so means other avenues of defense remain unexplored, when the benefits realized from the agreement seem likely to outweigh any benefits that might be obtained through further defense efforts.

The United States claims the plea agreement secured three benefits for Walsh:

> By not pleading guilty to the conspiracy charge, Walsh was not
> responsible for the conduct of other coconspirators. The parties
> agreed that Walsh's offense level was limited to 32 . . . and the United
> States agreed to recommend a sentence at the low end of the guideline
> range.

Answer (Doc. 94) at 19; *see also* Supp. Answer (Doc. 120) at 9.

### (a)  Walsh's Responsibility for Coconspirators' Conduct

The United States does not typically claim that a defendant is "not responsible for the conduct of other coconspirators" if he does "not[] plead guilty to the conspiracy charge." *See also* Counsel Dep. at 77:3–18 (Doc. 108 at 21). The Sentencing Guidelines say he is. *See* U.S.S.G. § 1B1.3(a)(1)(B), (3) & cmt. nn. 1, 3–4 (Nov. 1, 2016) (defining "relevant conduct" to include "jointly undertaken criminal activity . . . whether or not charged as a conspiracy").

At any rate, a plea agreement that does not require a defendant to admit to conspiracy is "highly beneficial" only if the United States has a strong prospect of proving the defendant guilty of conspiracy and if the defendant would lose something if convicted of conspiracy instead of something else.

As trial counsel said in his deposition, a conspiracy charge may "blossom" over time, meaning that more incriminating evidence may come to light as coconspirators offer up testimony in the hope of earning reduced sentences. *See* Counsel Dep. at 74:22–75:11 (Doc. 108 at 20).  Unquestionably, that is a reasonable concern in any case.  The Court will specifically address timing below in Part 2.  At this point, the question is whether the plea agreement was so beneficial as to make accepting it reasonable even if that meant some avenues of defense remained unexplored.

Because a conspiracy charge requires evidence of a meeting of the minds, it

is harder to prove than a simple charge of possession with intent to distribute. There is no indication the United States thought it had such evidence. More importantly, however, the United States did not need it. The evidence indicated Walsh was a supplier. As such, he was directly, personally responsible for everything he gave to anyone, including CS2, who attributed "more than a kilogram of historical methamphetamine distributions" to Walsh. *See* Answer (Doc. 94) at 2; Presentence Report ¶¶ 23–24, 30. Walsh was responsible for all that weight regardless of whether the charge was conspiracy, possession with intent to distribute, or distribution. The United States has not suggested it had evidence that CS2 committed other crimes, such as possessing a firearm in furtherance of drug trafficking, that could, through a conspiracy theory, be attributed to Walsh. And Walsh's guilty plea to the superseding information's charge of "500 grams or more of methamphetamine," Superseding Information (Doc. 41) at 1–2, necessarily established that Walsh possessed and intended to distribute more than the 280 grams found in his home on June 17, 2017.

Walsh gained little if anything by dismissal of the conspiracy charge.

### (b) Limiting the Base Offense Level to 32

The United States also claims the plea agreement was "highly beneficial" to Walsh because it "limited" the sentence.

The statutory penalty range was the same under the indictment and under the

superseding information.  Fifty or more grams of methamphetamine, *see* Indictment (Doc. 1) at 2, is punished as harshly as 500 or more grams of a substance containing methamphetamine, *see* Superseding Information (Doc. 41) at 1–2.  The mandatory minimum penalty under each charge was ten years in prison. The maximum penalty under each charge was life in prison.  This is the highest available statutory penalty range.  *See* 21 U.S.C. § 841(b)(1)(A)(viii).

The plea agreement bound both parties "to recommend that the drug amount attributable to Walsh is no more than a Base Offense Level of 32."  Plea Agreement (Doc. 42) at 6 ¶ 6 para. 2.  The United States does not claim it possessed, but agreed or chose not to use, evidence that could have elevated the base offense level to 34.[3]  And the base offense level was 32 regardless of whether Walsh was responsible for 1.516 kilograms of a substance containing methamphetamine, or that amount plus 28 grams of heroin for a drug equivalency of 3.06 kilograms of marijuana, or, instead, only the 260.8 grams of actual methamphetamine found in his home.  *See* U.S.S.G. § 2D1.1(c)(4) (Nov. 1, 2016); *see also* Presentence Report ¶ 30; *see also id.* ¶ 91 (noting that plea agreement "has no impact on the Sentencing Guidelines"); Change of Plea Tr. (Doc. 77) at 19:10– 13, 28:4–31:12; Sentencing Tr. (Doc. 78) at 3:21–5:16, 6:21–7:17.

---

[3] The presentence report does not indicate the purity of the 14 grams or so of methamphetamine involved in the controlled buys in the fall of 2016, but even at a purity of 100%, these small amounts would not change the base offense level.

14

In deposition, counsel explained that he wanted to retain "the ability to argue that [the base offense level] would be something less" than 32. Counsel Dep. at 77:19–78:1 (Doc. 108 at 21). The methamphetamine found in Walsh's home—260.8 grams of actual methamphetamine—could not possibly support a base offense level less than 32. *See* U.S.S.G. § 2D1.1(c)(4) ("at least 150 G but less than 500 G of Methamphetamine (actual)").

Like all defendants who plead guilty, with or without a plea agreement, Walsh received a three-level reduction in his offense level. This reduction is beneficial, but it does not indicate that the plea bargain or the superseding information was "highly beneficial" to Walsh.

Limiting the base offense level to the only level supported by the evidence was of no particular benefit to Walsh. And trial counsel had no realistic hope of arguing for a lower base offense level.

### (c)  Recommendation of Low-End Guideline Sentence

Third, the United States claims the plea agreement was "highly beneficial" to Walsh because it bound the prosecution to recommend a sentence at the low end of the guideline range. This was a genuine benefit. The question remains whether this possibility justifies the United States' characterization of the plea agreement.

Had Walsh entered an open plea to the indictment, he would have been convicted on two counts rather than one, and the United States would not have had

to recommend a sentence at the low end of the advisory guideline range.  As is typical in this District, the plea agreement did not guarantee a § 5K1.1 motion would be filed even if Walsh provided good information.  *See* Plea Agreement (Doc. 42) at 7–8 ¶ 8.  Walsh's opportunity to earn a § 5K1.1 motion was the same with or without the plea agreement.  As a result, the statutory penalty range and the advisory guideline range of 108 to 135 months, and therefore the actual sentence, probably would have been the same:  the 120-month statutory mandatory minimum sentence.  To decide whether the promise of a recommendation for a low-end sentence was valuable, the Court must consider what Walsh gave up.

Walsh waived all collateral-attack claims and almost all right to appeal the sentence.  Most plea agreements in this District except two types of claims from waivers of collateral attack:  claims of ineffective assistance of counsel, and claims based on facts the defendant could not reasonably be expected to know at the time of the waiver.  By contrast, Walsh's plea agreement waived "any right to appeal or to collaterally attack the conviction, entry of judgment, and sentence," with three exceptions that are discussed below.  Although habeas counsel Heuwinkel offers a different view based on the colloquy at the change of plea hearing, *see* Br. in Supp. of Mot. for Discovery (Doc. 91) at 4–8; Reply (Doc. 106) at 27–30, trial counsel could have interpreted the language of the plea agreement in only one way:  "The defendant acknowledges that this waiver shall result in the dismissal of any appeal

16

or collateral attack the defendant might file challenging the plea, conviction or sentence in this case." Plea Agreement (Doc. 42) at 6–7 ¶ 8.[4]

In responding to Walsh's § 2255 motion, the United States asserts only that the plea agreement waived the *Brady* claim, not that Walsh's claim of ineffective assistance is also waived. But if the language of the plea agreement waives a *Brady* claim, why would it not also waive a *Strickland* claim? If there were any ambiguity in the broad waiver, it appears to be resolved by the provision of the plea agreement that would have applied if the United States *had* filed a § 5K1.1 motion. That provision specifically excepted ineffective assistance claims from the waiver of collateral attack. *See* Plea Agreement at 8 para. 2. In short, the plea agreement waived *all* collateral attack if the United States did *not* file a § 5K1.1 motion, and it waived collateral attack *except* ineffective assistance claims if the United States *did* file a § 5K1.1 motion.

In the end, the United States did *not* file a § 5K1.1 motion. Since the United States is not asserting that Walsh waived his ineffective assistance claim, the Court will not consider whether the waiver is enforceable. The point is that trial counsel could not reasonably expect the plea agreement would preserve *any* meaningful

---

[4] "Collateral attack" is a capacious term encompassing any challenge to a conviction or sentence after the opportunity for direct review closes, whether formulated as a motion under 28 U.S.C. § 2255, a habeas petition under 28 U.S.C. § 2241, or another petition for an extraordinary writ. *See, e.g.*, Black's Law Dict. (11th ed. 2019).

right to collateral attack if the United States did not file a § 5K1.1 motion.

As mentioned, Walsh preserved his ability to appeal the sentence on three specific grounds:  a sentence above the guideline range, an upward departure under chapter 5K of the Guidelines, or a sentence that "exceeds the statutory maximum" of life in prison.  The first of these is a common and potentially valuable reservation in a plea agreement.  The record does not suggest a realistic basis for an upward departure under chapter 5K, so the second reservation appears dubious.  The third severs contact with reality.  *See, e.g.*, Change of Plea Tr. (Doc. 77) at 13:3–9, 20:17–22:1.  An open plea would have preserved all of these grounds for appeal, all grounds for appeal arising after entry of the guilty plea, and all viable grounds for collateral attack.  *See, e.g., Class v. United States*, __ U.S. __, 138 S. Ct. 798 (2018); *United States v. Broce*, 488 U.S. 563 (1989); *Blackledge v. Perry*, 417 U.S. 21 (1974).

The language of the waiver strongly suggests Walsh gave up a lot more than he gained from the United States' promise to recommend a low-end guideline sentence.  It also suggests trial counsel did not understand what Walsh waived.

### (d)  Conclusion:  Plea Agreement

After fully advising the client of the proposed tradeoffs, a lawyer can reasonably cut some corners when a client stands to gain a highly beneficial plea agreement, even if the lawyer harbors some doubts about the strength of the

prosecution's case.  Here, however, the plea agreement counsel negotiated was not "highly beneficial to Walsh."  Its terms do not justify or explain any curtailment of counsel's defense.

The next question is whether the evidence shows counsel's performance was more likely reasonable or unreasonable, with every effort made both to eliminate the distortion of hindsight and to perceive how counsel's performance was reasonable.

### 2.  What Discovery Did Counsel Receive and When?

On June 17, 2017, Walsh's house was searched pursuant to a warrant, and he was arrested.  State authorities charged him initially but dismissed those charges on January 29, 2018.  *See* Presentence Report ¶ 67.  Walsh was federally indicted on December 21, 2017, and released on conditions on January 17, 2018.  Trial counsel had agreed to take the case by January 23, 2018, and was appointed on January 24.

The client chooses the objectives of counsel's representation.  *See McCoy v. Louisiana*, __ U.S. __, 138 S. Ct. 1500, 1512 (2018).  In his deposition, counsel explained that Walsh had three objectives.  He wanted to help his wife avoid criminal liability.  He wanted to debrief in order to reduce his sentence below the ten-year mandatory minimum.[5]  Counsel Dep. at 25:1–9, 74:13–21 (Doc. 108 at 8,

---

[5] The Court does not know when Walsh debriefed with law enforcement, but his attempt to cooperate was not successful.

20).  And, counsel conceded, "[I]n fairness to Mr. Walsh, I'm sure his primary goal was to have this whole thing disappear." *Id.* at 74:17–18 (Doc. 108 at 20).

On January 29 and 30, 2018, the United States made the first tranche of discovery available to counsel.  *See* Discovery Index (Doc. 95-1).  It consisted of 639 pages of reports or statements plus photographs, phone records, some recorded interviews, some recorded buys, and Walsh's criminal history.  The application and warrant authorizing the search of Walsh's residence and a 15-page case report compiled by the Madison County Sheriff's Office were included.  *See, e.g.*, Discovery Index (Doc. 95-1) at 3 No. 10 (listing Bates 526–551) (including MCSO Case Report), No. 11 (listing Bates 552–600) (including warrant application), No. 12 (listing Bates 601–621) ("Evidence"), No. 13 (listing Bates 622–637) (Walsh's criminal history).  These central components were a small portion of the total discovery produced.  Counsel recalled, "A lot of it was ancillary, frankly it was some of the most unusual discovery I've ever seen."  Counsel Dep. at 23:1–3 (Doc. 108 at 7).

On February 6, 2018, counsel moved for a continuance.  He explained he had "not been able to . . . meet with Mr. Walsh" because counsel was out of town from January 31 to February 4.  He also planned to be out of the country for the last two weeks of February.  *See* Mot. to Continue (Doc. 25) at 1–2.  As a result, he said, he needed additional time "to review discovery, research potential pretrial

20

motions, and interview witnesses."  Br. in Supp. (Doc. 27) at 1, 4.  The Court

granted the motion and reset the motions deadline for March 19, with a plea

agreement due by April 19 and jury trial set for April 30, 2018.

On February 8, 2018, counsel moved *ex parte* for authority to expend

Criminal Justice Act funds of up to $2,400.00 for paralegal services and up to

$2,400.00 for the services of an investigator, Mark Fullerton.  *See* Mots. & Brs.

(Docs. 30–33).  The motions were not ruled on at that time.

Counsel recalled that he and Walsh "sat down in the same room with a

printed copy of the discovery and went through it together . . . at Mark Fullerton's

office."  "[T]hen there were other times where we reviewed portions of it if he had

a particular question or I had a particular question."  Counsel did not "recall

drawing [Walsh's] attention specifically to" the search warrant, but it "would have

been in the discovery that was available for him to review at our initial meeting."

Counsel Dep. at 22:2–23 (Doc. 108 at 7).  Walsh violated the conditions of his

pretrial release and was arrested on February 14, 2018.  Counsel had not met with

Walsh before February 6, when he filed his motion to continue.  The meeting at

Fullerton's office, therefore, occurred between February 6 and February 14.

On February 27, 2018, counsel's motions for CJA funds were "DENIED

WITHOUT PREJUDICE subject to refiling in compliance with the CJA Policies"

adopted by the Ninth Circuit.  *See* Order (Doc. 40) at 2–4.  Counsel had not

specified the hourly rate of either service provider or the number of hours' work anticipated.  Counsel did not refile his motions.

On March 5 and 6, 2018, the United States produced a second, small, and final tranche of discovery.  It included "Evidence Log 9.6.2017," "Evidence Log 9.12.2017," "FBI Request to Examine Evidence," and photograph logs labeled "Fortner_2008 Ford" (presumably Walsh's vehicle), "Deputy Heavrin_Madison County Sheriff Storage Unit," and "Wood_[Walsh's address]"[6]; photos and videos related to "Res Search" (presumably meaning the search of Walsh's residence), including "Thompson Body Cam 1" and "Thompson Body Cam 2"; three items described as "N4-16-10-04, CI debrief," "N4-16-11-03, ETD," and "N4-16-11-08, ERD and ETD," and a statement and photograph log from Madison County Deputy Wes Heavrin.  *See* Discovery Index (Doc. 95-1) at 4–5.

The motions deadline expired on March 19, 2018, with no motions filed.  On April 11, five weeks after all discovery was provided, Walsh signed the plea agreement, and on April 17, counsel and the United States filed the superseding information, plea agreement, motion to change plea, and offer of proof.

Trial counsel had ample time to review discovery, consider his approach, and investigate.

---

[6] The address is redacted here, *see* Fed. R. Crim. P. 49.1(a)(5), but was included in the log.

### 3. The Dirty CI

All reasonable defense counsel would recognize the United States had a

strong case against Walsh because a warrant search of his home yielded "dope on

the table":  a little more than 280 grams of 99% pure methamphetamine.  Absent

some evidence that Walsh did not know it was there, the presence of this quantity

of virtually uncut methamphetamine in his home would probably persuade a

reasonable juror beyond reasonable doubt that Walsh possessed 50 grams of more

of methamphetamine with intent to distribute it.  The search alone established a

base offense level of 32 under the Sentencing Guidelines.  And 280 grams of

methamphetamine in a laundry basket strongly corroborates cooperating witnesses

who testify the defendant is the supplier of a conspiracy or routinely sells

methamphetamine.

All reasonable defense counsel would also recognize that Sheriff

Thompson's application for the search warrant depended heavily on a controlled

buy,[7] supervised by Thompson, "[w]ithin the last 7 days" before he submitted the

---

[7] The United States contends that "[e]ven without the information from the last controlled purchase [in June 2017], there still would have been ample probable cause to issue the search warrant of Walsh's home, and more than a kilogram of historical methamphetamine distributions described by other informants."  Answer (Doc. 94) at 21; *see also* Supp. Ans. (Doc. 120) at 11.  The warrant application contained no information about "historical methamphetamine distributions described by other informants," much less "more than a kilogram."  *See* Warrant Application (Doc. 84) at 1–8.  It included two controlled purchases conducted in October and November 2016, seven or eight months before the June 2017 purchase.  *See id.* at 6.  (Thompson did not say so, but these purchases consisted of a few eight-balls.)  Thompson described Walsh as "an associate of several people who live in Madison County"

warrant application to a judge.  The application spoke of a confidential informant ("CI"), known to Thompson as "someone who has lived for many years in Madison County" and "admitted to be involved in illegal methamphetamine use," as someone "familiar with the use and functioning habits of other methamphetamine users and dealers," and as someone with "a criminal history that includes past drug crimes."  Warrant Application (Doc. 84) at 7.  Thompson said the CI "who contacted me agreed to contact Walsh and conduct a controlled purchase of drugs from him in order to confirm the information he was providing was accurate and true."  *Id.* at 8.

Thompson then described the controlled buy:

Within the last 7 days, I had the informant make contact with Walsh who according to the informant, was trying to contact him via cell phone.  Walsh invited the informant to come to his house as he had done in the past for the purpose of selling him illegal drugs.  I met with the informant and searched him and his vehicle which were both free of any drugs and money.  The informant was provided police money to possess and surveillance was set up to follow the informant to [Walsh's address].  The informant was continuously surveilled to the location where s/he was seen going inside.  After a short time, the

---

[sic], including one specific person who had a criminal history but no drug offenses and was "one of the most frequent visitors" to Walsh's house.  An unnamed deputy had received "unconfirmed anonymous tips" that the visitor "had been dealing illegal drugs."  Warrant Application (Doc. 84) at 7.  And Thompson recited Walsh's criminal history: "his arrests include the crimes of felony assault, obstructing an officer, resisting arrest and felony drug possession and maintaining a dwelling for selling and use of controlled substances."  *Id.* at 8.  Thompson did not mention that Walsh's drug offenses were actually one arrest with two charges, and one conviction.  He also did not say these things occurred in 1983.  *See* Presentence Report ¶¶ 47, 48–66.

Without the June 2017 controlled buy, the warrant application falls far short of probable cause.  That is probably why the Sheriff pursued the controlled buy.

24

> informant left the address and was surveilled away from the location
> to a predetermined location where again we immediately searched
> their person and vehicle and found no drugs or money except for what
> they relinquished to law enforcement. The informant turned over to
> me a package containing a brown substance that he was sold to by
> [sic] Walsh using the police buy monies I had provided him
> previously. While inside, the informant saw several firearms easily
> accessible in the living-room. The brown substance field tested
> positive for Heroin.

Warrant Application (Doc. 84) at 8–9. Thompson's portion of the Madison

County Sheriff's Office Case Report described the controlled buy in identical

terms, except the report added, as the final sentence, "It [the heroin] was secured

into locked storage and placed into MCSO evidence." MCSO Case Report (Doc.

83) at 8–9.

On March 5, 2018—almost nine months later—Deputy Heavrin also

described the controlled buy. He named himself, Sergeant Craig Schroder, Deputy

Dan Birdsill, Chaplain Tom Luksha, and Sheriff Thompson as the officers

involved. *See* Heavrin Report (Doc. 86) at 1. Heavrin continued:

> The informant arrived driving a white single cab pickup truck. I did
> not observe who searched the informant when he exited the vehicle
> because I was still walking up to the informant's location. At some
> point a purple crown royal bag was recovered which contained a black
> case. Located within the case was a small butane torch, a plastic bag
> containing a white crystallized substance, which later tested positive
> for the presence of methamphetamine, and a glass pipe analogous to
> paraphernalia used for the inhalation of methamphetamines.
>     Schroder and I searched the interior cab. I did not locate any
> drugs or paraphernalia. Birdsill searched the bed of the truck. The
> informant was then sent to conduct the buy. All other persons left the

25

area except for myself.  After approximately 15 minutes all individuals, including the informant, returned to my location.  The informant exited the white truck and presented a piece of yellow notebook paper which contained a brown sticky substance within it. The substance later tested positive for the presence of heroin.

I received the suspected heroin from Thompson and was tasked with transporting the crown royal bag, its contents, and the heroin provided from the informant.  I do not recall who provided me with the crown royal bag.  I transported the items to the Madison County Sheriff's Office and photographed the items. . . . Schroder and I took 11 photographs of the items and created a photograph log . . . . On the photograph log I documented the drugs and paraphernalia located within the case which were seized from the informant prior to the drug buy.  I also documented the heroin in the folded yellow paper.

All items were placed inside an evidence bag.  Thompson took custody of the items and told us he would enter them into evidence. Thompson later told me not to write a narrative on the controlled drug buy because he was going to cover it in his narrative. . . .

Heavrin Report (Doc. 86) at 1.

Until Deputy Heavrin wrote his report, no officer other than Thompson wrote a report on the controlled buy.  Many officers who participated in the search wrote or submitted a log on it.  *See* MCSO Case Report (Doc. 83) at 8–15 (reports by Sheriff Thompson, Undersheriff Fortner, Sergeants Tenny and Schroder, Deputies Sturgill, Heavrin, Winn, and Richardson, and federal BLM Agent Manseau); Discovery Index (Doc. 95-1) at 5 No. 17 ("Photograph Log — Wood_[Walsh's address]"), No. 18 ("Wood-Res Search Photos").

Trial counsel said he "spotted the issue that one guy was saying one thing and another was saying another," Counsel Dep. at 41:23–42:1 (Doc. 108 at 12), but

he could not "say that I came to the conclusion, based upon the differences

between the two reports, that [Sheriff Thompson] lied as opposed to hav[ing] been

reckless, negligent, or some other state of mind," *id.* at 19:2–5 (Doc. 108 at 6).  He

agreed, however, that if he could "establish that a law enforcement officer was

untruthful, that's something that the criminal defense lawyers like to develop to

defend their clients." *See id.* at 19:23–20:7.

### 4.  Did Counsel Reasonably Decide Not to Investigate?

Thompson's omission of the fact the CI had methamphetamine on his person

or in his vehicle when he met the officers at the staging area does not immediately

affect the warrant application's validity.  The officers cleaned up the CI before

they sent him to Walsh's house.  Even if Thompson had revealed the CI's

peccadillo, the warrant probably would have issued.  A search warrant obtained by

presenting false information to a judge is invalid if the false information is material

to the judge's finding of probable cause. *See Franks v. Delaware*, 438 U.S. 154,

171–72 (1978).  But, by itself, Thompson's omission of the CI's baggage did not

even "make[] a substantial preliminary showing" that Thompson made a false

statement. *Id.* at 155.

Still, the differences between Thompson's warrant application and

subsequent report, on the one hand, and Heavrin's report, on the other, raised

questions that should have interested Walsh's defense attorney—questions not

27

about the CI, but about Thompson.  The warrant application, after all, did not

depend on the CI's credibility.  Thompson laid out facts to support an inference

that the CI was closely controlled the entire time.  The warrant application

depended on Thompson's veracity.

Heavrin said, "Schroder and I searched the interior cab" and "Birdsill

searched the bed of the truck."  Heavrin did not say Thompson searched either the

informant or the vehicle.  Thompson said, "*I* met with the informant and searched

*him and his vehicle* which were both free of any drugs and money."  Possibly

Thompson searched the informant and the truck before Heavrin arrived.  In that

case, he might have been the officer who found the methamphetamine, and he

might reasonably want another search to make sure he did not miss anything.  But

then why he would omit these facts from his application and report, and why

would he not want other officers to report they thoroughly searched everything

before the CI went to Walsh's house?  Possibly Thompson did not search the truck,

because Heavrin, Schroder, and Birdsill did.  But then Thompson did not tell the

truth in the warrant application, because he said he searched the vehicle.

A reasonable defense attorney would want to know at least something more

about these apparent contradictions.  Why did Thompson omit the CI's baggage?

Did he omit anything else?  Why did he tell Heavrin not to write a report?  These

questions may have had innocent answers, but counsel did not follow up on them.

If trial counsel had failed to recognize the discrepancy between Thompson's and Heavrin's reports, that would be problematic.  The United States is unlikely to waste its time prosecuting cases marred by glaring errors, so defense counsel must be alert to merely potential errors.[8]  But whether an oversight would amount to ineffective assistance does not matter.  In his deposition, trial counsel plainly said he did not overlook anything.  He saw the discrepancy between Thompson's and Heavrin's accounts.  He contemplated a few different explanations, and not all of them were innocent:

> Heuwinkel:   So you read [Heavrin's report] that it's possible that *one of the officers brought this bag*?
>
> Counsel:   Oh, *not necessarily*.  It could have been one of the other officers searched the CI before Thompson searched him and that other person may have gotten it from him, and Thompson may have been accurate that Thompson searched him, and when he searched him he was clean.
>
> Heuwinkel:   I see.
>
> Counsel:   *Those* are possibilities.  I'm not saying that's what happened, but those are—it's just it is what it is.
>
> Heuwinkel:   Again, you didn't do anything to investigate whether or not he was in fact carrying drugs on him to the controlled buy, correct?
>
> Counsel:   No, for the reason I stated before; and that is, I didn't

---

[8]  In deposition, trial counsel said, "I sure wish someone would have told me that DCI had an ongoing investigation" into Sheriff Thompson.  Counsel Dep. at 26:24–27:1 (Doc. 108 at 8).  Expecting the United States to disclose all potential weaknesses in the government's case is unreasonable.

see it as a seminal fact—it didn't surprise me, and I didn't see it as a seminal fact as it relates to finding a probable cause for the search warrant.

Heuwinkel: Because you didn't interview any of those officers at any time, correct?

Counsel: That's correct—well, you said "because," let me just take the "because" off and just say I did not, as I've stated.

Heuwinkel: You did not interview any of these people. But you understood this as saying some cop there found these drugs on a confidential informant, correct?

Counsel: Most likely. Theoretically you might say, Oh, it was found somewhere on the ground around, but given the nature of the report, I think somebody would likely have found the drugs on him at some time.

Heuwinkel: And again, you didn't ask anybody whether that was in fact true, you didn't interview anybody to find out?

Counsel: I think I've answered that.

Heuwinkel: The answer is no?

Counsel: The answer is no.

. . .

Heuwinkel: Did you try to interview Sheriff Thompson?

Counsel: No.

Heuwinkel: Did you try to interview Deputy Heavrin?

Counsel: No.

| Heuwinkel: | Did you try to interview any of the deputies operating under Sheriff Thompson? |
|---|---|
| Counsel: | No. |

. . .

| Heuwinkel: | Did you call the U.S. attorney and ask him, Hey, what's up with this Deputy Heavrin report? |
|---|---|
| Counsel: | No, I did not ask that question. |

. . .

| Heuwinkel: | Did you ever interview any of the case agents, the federal agents involved in the case? |
|---|---|
| Counsel: | No. |
| Heuwinkel: | Did you have your investigators or ask your investigators to do so? |
| Counsel: | No. |
| Heuwinkel: | Do you know whether they did so? |
| Counsel: | I don't believe so. |

Counsel Dep. at 50:23–52:8 (Doc. 108 at 14) (emphases added), 29:13–25 (Doc.

108 at 9), 57:4–11 (Doc. 108 at 16).

Counsel believed Heavrin's and Thompson's descriptions "[b]oth . . .

indicate directly or indirectly that *four different officers agreed* that the CI went in

clean and came out dirty." Counsel Dep. at 30:22–31:1 (Doc. 108 at 9) (emphasis

added).  Neither Heavrin's report nor Thompson's application or report say

31

anything at all about what any other officer agreed or observed or thought or said. Since no one else wrote a report, counsel could not know what anyone else observed unless he asked.

As trial counsel contemplated the possibilities, he could have thought it was likely that Sheriff Thompson did not know the CI showed up dirty. He could have thought it was likely Thompson knew the CI was dirty but did not say so in the warrant application because he did not think it was important. He could have thought it was very unlikely albeit "possible that one of the officers brought this bag" with methamphetamine in it to the controlled buy. But he could not reasonably decide not to care whether the most unlikely possibility was true. All the possibilities, even the likely ones, were speculative. That is why counsel had to ask someone some questions.

"[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. What was the reasonable professional judgment behind counsel's decision not to follow up on Heavrin's report? It appears to be the fact that Walsh "did not deny these buys had taken place." Counsel Dep. at 55:7–8 (Doc. 108 at 15). If Walsh knew he sold heroin to a CI on June 11, 2017, then counsel may have had a good enough reason to believe he would not gain anything by further investigation of Thompson's

warrant application.

But counsel's deposition suggests Walsh did *not* know that.  First, Walsh's wife was also charged with drug trafficking, and one of Walsh's objectives was to protect her.  If she sold heroin to the CI on June 11, Walsh might not even have known about it.  Even if she did not sell anything, Walsh might have inferred she did, because Thompson said the CI returned from the house with heroin.

Second, multiple CI's were involved in the case.  Walsh did not know who they were:

> Heuwinkel:  Did [Walsh] ever ask you to investigate any of the confidential informants in this case?
>
> Counsel:  No.
>
> Heuwinkel:  Did you ever make any attempt to determine who those confidential informants were?
>
> Counsel:  In discussions with — I did have discussions with Martin, and he was wondering who this might be or who that might be, and we had several of those discussions trying to place a name to them.
>
> Heuwinkel:  Did you ever ask your investigator to find out anything about the confidential informants?
>
> Counsel:  No.  I guess I need to put that in context as well. Martin did not deny these buys had taken place.
>
> . . .
>
> Bartleson:  . . . From your discussions with your client

during your representation of him prior to sentencing and his change of plea, during that process were you and he aware to whom these distributions of methamphetamines were made?

Counsel:     His own distributions?

Bartleson:   Uh-huh.

Counsel:     Yes.  And again, I can't pin it here, some were identified sources, some were unidentified sources. . . . I can't necessarily say okay, this one he knew and that one he knew and he knew who that one was.  But yes, he was aware of the different players involved and to whom he was dealing.
. . .
His story changed several times throughout my representation as to whether he was selling to this person or that person was selling to him or how much was being sold, whether he was on the receiving end or he was on the selling end. So there were some disputes about maybe some amounts or maybe who this was as opposed to who that was, but in general, no, he did not dispute the activity.

Counsel Dep. at 54:20–55:8 (Doc. 108 at 15), 80:14–81:2, 81:10–17 (Doc. 108 at 21–22).

*Because* Walsh sold methamphetamine to several people, he could not have known whether the unidentified CI's the United States relied on were competent witnesses.  A person who does not traffic in drugs knows any CI accusing him of drug trafficking is lying, regardless of who the CI is.  But if a person knows he

34

(and/or his wife) sold methamphetamine to, say, three people, he cannot know whether the prosecution has competent evidence against him until he knows who the CI is.

Regarding "the fact that the CI showed up dirty," trial counsel recalled he "had at least several conversations with Mr. Whittaker [the prosecutor] about my feeling that that may be an issue that we could use to Mr. Walsh's advantage at sentencing." Counsel Dep. at 30:1–13 (Doc. 108 at 9); *see also* Sentencing Tr. (Doc. 79) at 30:20–31:25. Because the CI reported seeing firearms in Walsh's residence, his or her credibility could have been an issue at sentencing. But the dirty CI played almost no role in the United States' case against Walsh. It relied on other CI's and on what it learned while executing the search of Walsh's residence to obtain the two-level enhancement for possession of a firearm. *See* U.S.S.G. § 2D1.1(b)(1); Sentencing Tr. at 10:3–12:17 (prosecutor's summary of evidence to be offered), 13:4–35:10 (agent's testimony). And, at any rate, planning to question the CI's credibility at sentencing could not reasonably explain or justify counsel's decision not to investigate Thompson's warrant application or the controlled buy.

## 5. Conclusion: Deficient Performance Prong

By March 6, 2018, counsel knew all he needed to know to make a reasonable decision about further investigation. The 280-gram fruit of the search

warrant was the most incriminating and incontrovertible evidence against Walsh. The controlled buy was the heart and soul of the warrant application. Apart from the controlled buy, the application was ridiculously light. Only Thompson and Heavrin wrote reports, so counsel could not have known what any other officer actually saw unless he asked. The CI was described as a methamphetamine user, but he returned with heroin. Although Thompson said he set up the buy with the CI, he did not say what the CI intended to purchase or how much it would cost. Multiple CI's might testify against Walsh, and one was essential to the warrant application, but counsel did not try to find out who they were. Not knowing what happened at the controlled buy, not knowing who the CI's were, with the plea deadline more than a month away and trial nearly two months away, counsel decided not to investigate.

The Court can perceive no strategic or tactical reason why, in view of the discovery and the timing in the case, a criminal defense lawyer would do nothing at all to investigate what happened at the controlled buy or who the unidentified CI's were. Counsel's decision not to investigate any of the possibilities he says he contemplated was unreasonable.

### B. Prejudice

To meet the second, prejudice prong of the *Strickland* test, Walsh must show "a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* It is *less* than a preponderance of the evidence, *see id.*, but it must be substantial and not merely conceivable, *see Harrington v. Richter*, 562 U.S. 86, 112 (2011).

The record contains ample evidence of prejudice. On March 16, 2018, when a defense investigator might have asked questions, Deputy Heavrin answered questions from investigators with the Montana Department of Justice's Division of Criminal Investigation. Heavrin said that Thompson interrupted Heavrin and Schroder's handling of the evidence from the controlled buy and told them he would take care of it. *See* Heavrin Interview (Doc. 112) at 20. Thompson's report stated that the heroin "was secured into locked storage and placed into MCSO evidence." MCSO Case Report (Doc. 83) at 8–9. But, Heavrin said, the evidence disappeared:

> [S]omehow there they noticed that I got photographs here and nothing is correlated with them, there's no narrative about it, there's no documentation other than my pictures of this evidence and it's not entered or tagged with an evidence number and the location of where it's at is, it's unknown.

Heavrin Interview (Doc. 112) at 22; *see also, e.g.*, Fortner Interview (Doc. 104-7) at 8–9.

Thompson's failure to mention that the CI showed up dirty, Heavrin's

statements that Thompson told him not to write a narrative on the controlled buy, and the subsequent disappearance of the evidence suggest not only further dishonesty but also premeditated evidence-tampering on Thompson's part. This was not the only occasion when Thompson disrupted normal evidence-handling procedures in the Madison County evidence room. *See, e.g.*, Hilyard Report (Doc. 111) at 7 paras. 2, 3 (noting that Thompson recharacterized evidence technician's log by changing description of an exhibit from "white substance" to "ashes from [funeral] urn" without technician's knowledge). Based on interviews of Deputy Birdsill, Chaplain Luksha, and Thompson, it is possible Thompson alone had eyes on the CI at Walsh's home. *See* Birdsill Interview (Doc. 114) at 11–13; Luksha Interview (Doc. 115) at 14–15; Thompson Interview (Doc. 113) at 13–15.[9]

Thompson frequently used passive voice throughout his application and report. Passive voice can create the impression—an impression defense counsel believed—that several officers all saw the same thing. But looking for Thompson's uses of first-person active voice demonstrates how central his veracity actually was to the case against Walsh:

---

[9] A jury later found, beyond reasonable doubt, that Thompson "canceled" an outstanding warrant for the CI's arrest—something he did not have authority to do. *See* Aff. in Supp., *State v. Thompson*, No. DC-29-2018-20 (Mont. Fifth Jud. Dist. Nov. 5, 2018) (Doc. 82-8) at 5. This occurred in November 2017, after the search of Walsh's home, while state charges were pending against him, and before his federal indictment.

I had the informant make contact with Walsh[10] .... I met with the informant and searched him and his vehicle which were both free of any drugs and money.[11] ... I was in the football field across from Walsh's place. ... in the grandstands[12] ... [The CI] parked his vehicle out front, I could see where he parked.[13] ... I could see him go in the front door.[14] ... I brought it [i.e., the informant's heroin] back [to the Sheriff's Office].[15] ... During [execution of] the search [warrant], I found in the clothes basket in the hallway, under some clothing, a cigar box containing 4 bags of a crystalline substance that field tested positive for methamphetamine.[16]

So far as the Court can tell from the existing record of the case, no other officer could corroborate any of these statements.

The Court has no confidence in the outcome of the proceedings against Walsh. Had counsel asked any questions of any officer about the controlled buy, there is a reasonable probability he would have uncovered support for a motion under *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978), and/or Walsh would not have been convicted.

## C. Conclusion: Ineffective Assistance of Counsel

In view of Sheriff Thompson's prominent role in the case, trial counsel prejudiced Walsh by unreasonably failing to investigate possibilities counsel

---

[10] MCSO Case Report (Doc. 83) at 8 para. 5.

[11] *Id.*

[12] Thompson Interview (Doc. 113) at 14.

[13] *Id.* at 20.

[14] *Id.*

[15] *Id.* at 24.

[16] MCSO Case Report (Doc. 83) at 10 para. 2.

himself recognized when he reviewed discovery. The conviction is dirtier than the CI. Questions remain about what actually happened, but the answers should be developed in the criminal case, where the burden of proof will be appropriately allocated between Walsh and the United States. Because Walsh proves he is entitled to relief under 28 U.S.C. § 2255, his motion for discovery is moot.

Accordingly, **IT IS ORDERED**:

1. Walsh's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (Docs. 71, 82) is **GRANTED**. Walsh's motion to conduct discovery (Doc. 87) is **DENIED AS MOOT**.

2. The Judgment of August 22, 2018 (Doc. 65), is **VACATED**. Walsh will remain in pretrial custody pending a detention hearing upon his return to this District.

3. The United States Marshals Service will promptly transport Walsh to the District of Montana and must notify chambers when Walsh arrives.

4. Ryan Heuwinkel's appointment as habeas counsel is **TERMINATED** and Heuwinkel is **APPOINTED** to represent Walsh in the criminal case. *See* 18 U.S.C. § 3006A(a)(1).

5. Trial on the Indictment (Doc. 1) will be set by separate Order after Walsh arrives in this District. The speedy trial clock, however, starts as of the date of this

Order.  *See* 18 U.S.C. § 3161(d)(2).

DATED this 11ᵗʰ day of June, 2020.

Dana L. Christensen, Chief Judge
United States District Court


cc:     USMS
        CJA Supervising Att'y

41